MARTIN, Circuit Judge:
Richard Villarreal appeals the District Court’s dismissal of his Age Discrimination in Employment Act (ADEA) lawsuit. He alleges that RJ Reynolds Tobacco Company discriminated against him on the basis of age when it rejected his application for employment. This appeal raises two important questions. The first is a question of first impression in this Circuit: whether § 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(2), authorizes disparate impact claims by applicants for employment. We hold that it does, though not because the language of the statute plainly requires this reading. In fact, the statute is unclear on this question. However, the Equal Employment Opportunity Commission (EEOC), the agency charged with enforcing the ADEA, has reasonably and consistently interpreted the statute to cover claims like Mr. Villarreal’s. We must defer to that reading rather than venture our own guess about what the statute means. The second question is whether Mr. Villarreal is entitled to equitable tolling of the ADEA’s limitations period. We conclude that he is, and reverse the judgment of the District Court for both of these reasons.
I.
RJ Reynolds employs regional sales representatives known as Territory Managers. With the assistance of recruiting services, the company used a set of “resume *1291 review guidelines” in screening applicants for these positions. These guidelines list a number of characteristics RJ Reynolds wanted in its new hires, some of which relate to age. For example, the guidelines tell hiring managers to target candidates who are “2-3 years out of college” but to “stay away from” candidates with “8-10 years” of prior sales experience. As it turns out, RJ Reynolds’s hiring statistics suggest a pattern of hiring younger applicants. Of the 1,024 people hired as Territory Managers from September 2007 to July 2010, only 19 were over the age of 40.
Mr. Villarreal first applied for a Territory Manager position in November 2007 by submitting an online application. He was 49 years old at the time. RJ Reynolds never responded to his application. Over two years later, on May 17, 2010, Mr. Villarreal filed a charge of unlawful discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that RJ Reynolds had discriminated against him on the basis of his age. The timing of this charge is relevant to Mr. Villarreal’s federal lawsuit because the ADEA requires a person to file a charge of discrimination within 180 days of the discriminatory act.[1] 29 U.S.C. § 626(d)(1)(A). Compliance with this 180-day limitations period is a “prerequisite” to bringing a federal suit. McClinton v. Ala. By-Prods. Corp., 743 F.2d 1483, 1485 (11th Cir.1984).
While his charge of discrimination was pending before the EEOC, Mr. Villarreal applied for a Territory Manager position five more times, and was rejected each time. He amended his charge of discrimination to add these applications and rejections. Finally, on April 2, 2012, the EEOC declined to take further action against RJ Reynolds, and issued Mr. Villarreal a right-to-sue notice.
Mr. Villarreal next filed this lawsuit, raising both disparate treatment (discriminatory intent) and disparate impact (discriminatory result) claims under the ADEA on behalf of himself and all other similarly situated applicants. The complaint acknowledged that Mr. Villarreal’s charge of discrimination had .been filed more than 180 days after his initial November 2007 application. However, Mr. Villarreal says the limitations period should be equitably tolled until April 2010 because “[t]he facts necessary to support [his] charge of discrimination were not apparent to him, and could not have been apparent to him, until less than a month before he filed his May 17, 2010 EEOC charge.”
The District Court granted RJ Reynolds’s partial motion to dismiss. First, it dismissed Mr. Villarreal’s disparate impact claim entirely, finding that the ADEA only allows suits for disparate impact claims brought by current employees, as opposed to applicants for employment like Mr. Villarreal. Second, it dismissed all claims related to hiring decisions before November 19, 2009, as untimely.[2] The District Court found that Mr. Villarreal was not entitled to equitable tolling for his November 2007 allegations because “[t]he Complaint does not specify which facts Plaintiff came to know in 2010, or how Plaintiff came to know them.”
*1292 Following the District Court’s ruling, Mr. Villarreal moved to amend his complaint to add facts in support of his equitable tolling argument. Mr. Villarreal’s proposed amended complaint alleged that he had not known about RJ Reynolds’s process for reviewing applications or its use of the resume review guidelines until he spoke with lawyers from Altshuler Berzon in April 2010. Indeed, RJ Reynolds never responded one way or the other to Mr. Villarreal’s 2007 application, so “[h]e did not even know whether his application had been reviewed at all, much less whether it had been rejected or screened out.”
The District Court found that the amendment would be futile and denied Mr. Villarreal leave to amend his complaint. It explained that Mr. Villarreal’s amended complaint had not stated a claim for equitable tolling for two reasons. First, Mr. Villarreal did not diligently pursue his rights because he did not contact RJ Reynolds to find out why his application had been rejected. And second, he failed to allege any misrepresentation or concealment by RJ Reynolds.
Mr. Villarreal voluntarily dismissed his remaining claim and filed this appeal, challenging the District Court’s rulings on both his disparate impact claim and equitable tolling. We consider each argument in turn.
II.
We first address whether § 4(a) of the ADEA authorizes disparate impact claims by people applying for jobs. Unlawful discrimination takes two forms: disparate treatment and disparate impact. In the employment context, disparate treatment happens when an employer treats some people less favorably because of a protected characteristic, such as race, religion, sex, or in our case, age. To prove this type of claim, a plaintiff must establish that the employer had the intent to discriminate. Int’l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In contrast, disparate impact happens when an employer uses “practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another.” Id. No proof of discriminatory intent is required for disparate impact claims. Id.
In Smith v. City of Jackson, Miss., 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), the Supreme Court held for the first time that the ADEA authorizes disparate impact claims. Smith was a case in which older employees had received smaller salary increases than their younger colleagues. Id. at 230, 125 S.Ct. at 1539. Because Smith involved only claims of current employees, it did not answer the question we face here: whether job applicants may bring disparate impact claims as well.
A.
As always, statutory interpretation begins with the language of the statute. If the statutory language is clear, then our inquiry ends. King v. Burwell, - U.S. -, -, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015). If the language is unclear, we see if the agency that enforces the statute has interpreted the ambiguity. If the agency has interpreted the ambiguity reasonably, then we defer to its view. See id.
Section 4(a) of the ADEA makes it unlawful for an employer:
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s age; [or]
(2) to limit, segregate, or classify his employees in any way which would de *1293 prive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s age
29 U.S.C. § 623(a). Smith noted “key textual differences” between these two provisions. Smith, 544 U.S. at 236 n. 6, 125 S.Ct. at 1542 n. 6 (plurality opinion). First, the two provisions treat motive differently. Subsection (a)(1) makes it unlawful to “discriminate against any individual ... because of such individual’s age.” This provision focuses on the employer’s (discriminatory) motives, and is the part of § 4(a) that authorizes disparate treatment claims. See Smith, 544 U.S. at 236, 125 S.Ct. at 1542. Subsection (a)(2) targets employer conduct that “would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.” This provision “focuses on the effects of the action on the employee rather than the motivation for the action of the employer,” so it is the part of § 4(a) that authorizes disparate impact claims. Id. Smith identified only this difference between the two sections of the statute. See id. at 236 & n. 6, 125 S.Ct. at 1542 & n. 6.
However another possible difference is the description of who can sue under each section. Both subsections use the term “any individual.” But they use it in different contexts. Subsection 4(a)(1) makes it unlawful “to fail or refuse to hire or to discharge any individual.” The verb “hire” makes clear that “any individual” includes job applicants. But § 4(a)(1) does not authorize disparate impact claims, so Mr. Villarreal’s argument is based on § 4(a)(2). Subsection 4(a)(2) also refers to “any individual.” Again, this section makes it unlawful for an employer “to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities.” This section targets exactly three categories of conduct: an employer’s actions that “limit, segregate, or classify his employees.” Within those three categories, the liability sweeps wide: any action that “would deprive or tend to deprive any individual of employment opportunities.” This is the very phrase that authorizes disparate impact liability, and the object of these verbs is the expansive term “any individual.”
This language has provoked the disagreement before us. Mr. Villarreal reads § 4(a)(2) to plainly cover his allegations. He notes that § 4(a)(2) makes it unlawful for an employer “to limit ... his employees in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual’s age.” 29 U.S.C. § 623(a)(2). He says RJ Reynolds “limited” its “employees” in a “way which would deprive or tend to deprive” an “individual” like him “of employment opportunities” because of his age. RJ Reynolds, in turn, directs us to the earlier term “his employees.” It says the later reference to “any individual” only includes these employees. RJ Reynolds reads § 4(a)(2) to cover only things a company does to “limit, segregate, or classify” its employees in a way that would deprive those employees of employment opportunities.
Both of these readings seem reasonable. That being the case, the plain language of the statute does not make clear whether job applicants like Mr. Villarreal may bring disparate impact claims. But before analyzing whether we can defer to the agency’s reading, we take stock of a few other arguments for each interpretation. These arguments underscore that § 4(a)(2) can reasonably be read in more than one way.
1.
In support of his reading, Mr. Villarreal points to the landmark decision Griggs v. *1294 Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In Griggs the Supreme Court unanimously held that the plain text of § 703(a)(2) of Title VII of the Civil Rights Act of 1964 authorized disparate impact liability. The language interpreted in Griggs was identical to the language of § 4(a)(2) except that it addressed discrimination based on “an individual’s race, color, age, religion, sex, or nationality” rather than “an individuars age.”
When the Supreme Court held in Smith that the plain text of § 4(a)(2) of the ADEA also authorized disparate impact liability, its analysis started with Griggs. The Court framed the question before it as “whether the ‘disparate-impact’ theory of recovery announced in Griggs ... is cognizable under the ADEA.” 544 U.S. at 230, 125 S.Ct. at 1539. And the Court’s answer to this question “beg[a]n with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.” Id. at 233, 125 S.Ct. at 1541 (plurality opinion).
As we noted, Smith involved disparate impact claims brought only by current employees. In Griggs, it is not as clear who won relief. Griggs began as a class action brought by current employees of a power plant on behalf of “employees who subsequently may be employed at the [plant] ... and all [African Americans] who may hereafter seek employment.” Griggs v. Duke Power Co., 420 F.2d 1225, 1227 (4th Cir.1970). Though the Supreme Court noted that the case was a class action, the Court also called the petitioners “a group of incumbent [African American] employees” and stated that “[a]ll the petitioners are employed at the Company’s Dan River Steam Station.” 401 U.S. at 426, 91 S.Ct. at 851. But the Court also considered whether the parallel Title VII language prohibited requirements that are imposed “as a condition of employment in or transfer to jobs” and “operate to disqualify [African Americans] at a substantially higher rate than white applicants.” Id. (emphasis added). We also know that the Supreme Court has continued to characterize Griggs as protecting “applicants for hire.” See Dothard v. Rawlinson, 433 U.S. 321, 328-29, 97 S.Ct. 2720, 2726-27, 53 L.Ed.2d 786 (1977). Just this summer, the Court said Griggs applied disparate impact liability to “hiring criteria.” See Tex. Dep’t of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., - U.S. -, -, 135 S.Ct. 2507, 2517, 192 L.Ed.2d 514 (2015).[3]
Mr. Villarreal argues that Griggs requires us to adopt his reading of § 4(a)(2). RJ Reynolds responds that all the references in Griggs to “applicants” and “hiring” concerned current employees seeking *1295 promotions or transfers, not job applicants. Either way, Griggs did not directly tell us whether the identical Title VII language covers job applicants. Neither has the Court had a chance to address this question since. That is because the year after the Griggs decision, Congress changed the relevant language of Title VII from “his employees” to “his employees or applicants for employment.” 42 U.S.C. § 2000e-2(a)(2). We know that Griggs did not decide whether Title VII applies to job applicants, so it does not require us to adopt Mr. Villarreal’s reading of § 4(a)(2). That said, the Supreme Court’s repeated references to job applicants and its continued characterization of Griggs as covering job applicants tells us at least that this reading is reasonable.
2.
Title VII relates to the question before us in another way: in 1972, Congress amended that statute to add the words “or applicants for employment” to the language that parallels § 4(a)(2) of the ADEA. See 42 U.S.C. § 2000e-2(a)(2). Congress has not amended § 4(a)(2) of the ADEA in the same way. Because Congress chose to change Title VII this way but did not make the same change to the ADEA, the District Court found that § 4(a)(2) cannot cover job applicants. The court quoted language from Gross v. FBL Financial Services, Inc., 557 U.S. 167, 174, 129 S.Ct. 2343, 2349, 174 L.Ed.2d 119 (2009) saying that the Supreme Court could not “ignore Congress’s decision to amend Title VU’s relevant provisions but not make similar changes to the ADEA.”
Gross involved a 1991 amendment to Title VII as opposed to the 1972 amendment to Title VII. Specifically, the Gross opinion derived two things from the fact that Congress did not amend the ADEA when it enacted the 1991 Title VII amendments. First, the Court noted that in 1991 Congress had “contemporaneously amended the ADEA in several ways.” Id. It explained that “negative implications raised by disparate provisions are strongest when the provisions were considered simultaneously when the language raising the implication was insertéd.” Id. at 175, 129 S.Ct. at 2349 (quotation omitted). But this lesson only goes so far, because we know that Congress did not amend the ADEA in 1972 when it amended Title VII to include “applicants for employment.”
Second, the 1991 amendment to Title VII was enacted to override the Supreme Court’s interpretation of statutory language. See id. Since Congress was rejecting the Court’s interpretation of Title VII, it made sense to assume that Congress knew the Court’s interpretation would apply to the ADEA language it left untouched. But the 1972 amendment was not enacted to reject the Supreme Court’s interpretation of the language at issue here. To the contrary, the Senate Committee on Labor and Public Welfare explained that the change to “[t]his subsection would merely be declaratory of present law.” S.Rep. No. 92-415, at 43 (1971). And the parallel House Report explained the change by quoting extensively from Griggs and declaring that “[t]he provisions of the bill are fully in accord with the decision” in Griggs. H.R.Rep. No. 92-238, at 21-22 (1971).
Congress has all kinds of reasons for passing laws, and presumably all kinds of reasons for not passing laws as well. The 1972 change to Title VII was part of a broad revamp of the statute aimed at expanding the jurisdiction and power of the EEOC. See George P. Sape & Thomas J. Hart, Title VII Reconsidered: The Equal Opportunity Act of 1972, 40 Geo. Wash. L.Rev. 824 (1972). When Congress undertook these changes the ADEA was administered by the Secretary of Labor, not the EEOC. See 42 U.S.C.A. § 2000e-4 (1978). *1296 We will not assume that Congress chose not to pass legislation modifying the ADEA simply because it did make this one change in a broader restructuring of Title VII.
3.
RJ Reynolds asks us to treat Smith in much the same way Mr. Villarreal asks us to treat Griggs. But as we’ve said, Smith did not involve disparate impact claims by job applicants. Neither did the Smith plaintiffs (like the Griggs plaintiffs) challenge policies that harmed both job applicants and current employees. While we recognize that the two concurring opinions in Smith referenced the fact that § 4(a)(2) does not expressly mention job applicants,[4] it is also true that the issue of whether applicants can bring disparate impact claims was neither argued by the parties nor relevant to the case. At most, the dicta in Smith’s concurrences, like that in Griggs, tells us that RJ Reynolds offers one reasonable reading of § 4(a)(2).[5] Notably, none of the opinions in Smith analyzed whether the EEOC deserves deference for its view on this particular question, as we must in the case before us.
4.
RJ Reynolds also presses the argument that the meaning of § 4(a)(2) can be clearly derived from the way other parts of the ADEA distinguish between employees and applicants for employment. For example, section 4(c)(2) makes it unlawful for a labor organization to “limit, segregate, or classify its membership” in any way that “adversely affectfs] [an individual’s] status *1297 as an employee or as an applicant for employment.” 29 U.S.C. § 628(c)(2). Section 4(d) extends the ADEA’s retaliation protections to “applicants for employment” and “applicants for membership” in a labor organization. Id. § 681(d). And section 12(b) describes age limits for “any personnel action affecting employees or applicants for employment.” Id. § 631(b). Finally, section 15 describes protections for “employees or applicants for employment,” “employees and applicants for employment,” and “an employee or applicant for employment.” Id. §§ 633(a)-(b). RJ Reynolds tells us these provisions show that Congress knew how to reference job applicants and intentionally chose not to in § 4(a)(2).
 But in contrast to § 4(a)(1) and these other provisions referenced by RJ Reynolds, § 4(a)(2) does not reference applicants for employment, and uses the general term “any individual.”[6] We know that “ ‘any’ is a powerful and broad word. It does not mean some or all but a few, but instead means all.” United States v. Fleet, 498 F.3d 1225, 1229 (11th Cir.2007). Still, we cannot ignore that Congress expressly protected applicants for employment in other provisions of the ADEA but declined to do so in § 4(a)(2). After all, “Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.” Dep’t of Homeland Sec. v. MacLean, - U.S. -,-, 135 S.Ct. 913, 919, 190 L.Ed.2d 771 (2015). And this “interpretive canon ... applies with particular force” when Congress uses an omitted phrase elsewhere in “close proximity.” Id.
That said, this interpretive canon does little to reveal whether Congress used the term “any individual” to exclude job applicants or to include them.[7] Even if Congress knew how to distinguish employees and applicants, the statute still prohibits an employer’s policies that “limit ... his employees in any way which would deprive or tend to deprive any individual of employment opportunities.” Indeed, perhaps these other provisions show that Congress knew how to use the more specific term “employees” (and used that term in close proximity, earlier in the same sentence) but chose the broader term “any individual.” Congress could have made it unlawful for an employer “to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any employee of employment opportunities.” Instead it said “any individual.”
*1298 5.
Finally, Mr. Villarreal and amici urge us to construe § 4(a)(2) to permit disparate impact claims from job applicants because this would fit the ADEA’s general purpose of protecting older job applicants. Congress’s concern for older job applicants was evident in a report written by the Department of Labor that led Congress to enact the ADEA. See U.S. Dep’t of Labor, The Older American Worker: Age Discrimination in Employment (1965). This report specifically described how seemingly neutral employment practices&emdash;includ-ing practices like the screening guidelines challenged by Mr. Villarreal&emdash;can impose a disparate burden on older job applicants. See id. at 3 (“Any formal employment standard which requires, for example, a high school diploma will obviously work against the employment of many older workers.”); see also id. at 12 (“Even for many plant production jobs in the major industries, employers for a variety of reasons seek young workers with high school educations or equivalent vocational training.”). In this way the report seemed to predict the disparate impact idea that Griggs made law seven years later. The report further analyzed the discriminatory effects of “institutional arrangements that indirectly restrict the employment of older workers,” id. at 15, as well as “employment practices which quite unintentionally lead to age limits in hiring,” id. at 22.
The report proposed legislation which was ultimately enacted as the ADEA. The ADEA clearly states that one of its purposes is to “promote [the] employment of older persons based on their ability rather than age.” 29 U.S.C. § 621(b). It also declares that “older workers find themselves disadvantaged in their efforts ... especially to regain employment when displaced from jobs” and that “the incidence of unemployment, especially long-term unemployment ... is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave.” 29 U.S.C. § 621(a).
Mr. Villarreal relies on these statements to argue that Congress intended for § 4(a)(2) to protect both current employees and prospective job applicants.[8] We agree that these statements show that Congress enacted the ADEA to address discriminatory hiring. But neither these statements of purpose nor the statute’s legislative history tell us what type of claim (disparate treatment, disparate impact, or both) an applicant for employment can bring. We decline to answer this question through inferences about the ADEA’s general purpose.
Because the text of § 4(a)(2) does not clearly resolve the issue in this case, we ask the question we must when faced with a vague statute: has the agency tasked with enforcing the statute given a reasonable reading?
B.
Subsection § 4(a)(2) of the ADEA clearly authorizes disparate impact claims. *1299 What is less clear is whether its reference to “any individual” includes job applicants, or whether the separate term “his employees” limits the entire provision to current employees. When a statute is ambiguous, policy choices belong to the agency that enforces the statute. See Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 2699, 162 L.Ed.2d 820 (2005) (“In Chevron, this Court held that ambiguities in statutes within an agency’s jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts.”).
The EEOC enforces the ADEA. We therefore defer to its views on the ADEA’s interpretation and application unless those views are unreasonable. See Fed. Express Corp. v. Holowecki, 552 U.S. 389, 403, 128 S.Ct. 1147, 1158, 170 L.Ed.2d 10 (2008) (“Where ambiguities in statutory analysis and application are presented, the agency may choose among reasonable alternatives.”); see also EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 115, 108 S.Ct. 1666, 1677, 100 L.Ed.2d 96 (1988) (“[I]t is axiomatic that the EEOC’s interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards. Rather, the EEOC’s interpretation of ambiguous language need only be reasonable to be entitled to deference.”).
The EEOC’s current ADEA disparate impact regulation, issued under its statutory rulemaking authority, 29 U.S.C. § 628, does not distinguish between prospective and existing employees. Instead, it states that, “[a]ny employment practice that adversely affects individuals within the protected age group on the basis of older age is discriminatory unless the practice is justified by a ‘reasonable factor other than age.’ ” 29 C.F.R. § 1625.7(c). The regulation extends disparate impact liability to all “individuals within the protected age group.” The EEOC argues that the regulation therefore established the agency’s view that § 4(a)(2) protects any individual an employer discriminates against, regardless of whether that individual is an employee or job applicant. Chevron requires us to defer to this regulation’s reasonable interpretation of the ADEA’s “standards for a disparate-impact claim.” Smith, 544 U.S. at 240, 125 S.Ct. at 1544 (plurality opinion). See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
RJ Reynolds responds with two arguments for why the EEOC’s construction is not entitled to deference. First, the company claims 29 C.F.R. § 1625.7 is not relevant to this case because it interprets a separate provision of the ADEA. Second, it argues that the regulation does not clearly address the question in this case. We address each of these arguments in turn. In doing so, we are mindful that even if we assume that 29 C.F.R. § 1625.7 is ambiguous by virtue of an inferred limitation on its broad phrase “individuals within the protected age group,” we still owe deference to the EEOC’s view because the agency has reasonably and consistently insisted on this view for decades.
1.
RJ Reynolds argues that 29 C.F.R. § 1625.7 is not entitled to deference on the question of whether § 4(a)(2) permits disparate impact liability for applicants because this regulation concerns a separate provision of the ADEA. The company argues that 29 C.F.R. § 1625.7 merely applies the “reasonable factor other than age” (RFOA) defense from Section 4(f)(1) to ADEA liability, rather than providing a *1300 basis for disparate impact liability, which comes from § 4(a)(2).
But we read Smith to foreclose this argument. Because the Smith plurality found that the text of § 4(a)(2) plainly authorizes disparate impact liability, it was not necessary for a majority of Justices to analyze whether and how courts must defer to the EEOC’s disparate impact regulation. The plurality did reference this regulation to explain why the RFOA provision cannot be understood separate from the statutory scheme as a whole. See 544 U.S. at 239-40, 125 S.Ct. at 1544 (plurality opinion). The plurality also explained that EEOC has “consistently interpreted the ADEA to authorize relief on a disparate-impact theory” and that 29 C.F.R. § 1625.7 “set[s] forth the standards for a disparate-impact claim.” Id.
Justice Scalia joined the Court’s holding that the ADEA permits disparate impact liability, but he reached his view by way of deference to 29 CFR § 1625.7. He first explained why 29 CFR § 1625.7 deserves deference as an interpretation of § 4(a)(2):
As [the] text [of § 4(f)(1) ] makes clear, the RFOA defense is relevant only as a response to employer actions “otherwise prohibited” by the ADEA. Hence, the unavoidable meaning of the regulation at issue is that the ADEA prohibits employer actions that have an “adverse impact on individuals within the protected age group.” 29 CFR § 1625.7(d) (2004). And, of course, the only provision of the ADEA that could conceivably be interpreted to effect such a prohibition is § 4(a)(2).
Id. at 246, 125 S.Ct. at 1548 (Scalia, J., concurring). Justice Scalia then specified why the regulation’s interpretation of “otherwise prohibited” deserved deference, even though the regulation was focused on interpreting the term “reasonable factors other than age.” In doing so, he responded to Justice O’Connor’s view:
Justice O’Connor ... argues that the EEOC’s interpretation of what is “otherwise prohibited” by the ADEA is not entitled to deference because the Court concludes that the same regulation’s interpretation of another term ... is unreasonable. Her logic seems to be that, because the two interpretations appear in the same paragraph, they should stand or fall together. She cites no case for this proposition, and it makes little sense. If the two simultaneously adopted interpretations were contained in distinct paragraphs, the invalidation of one would not, of course, render the other infirm.... I can conceive no basis for a different rule simply because the two simultaneously adopted interpretations appear in the same paragraph.

Id.

Although Smith addressed a slightly different question than we have here, our study of it causes us to reject RJ Reynolds’s argument “that the RFOA clause operates independently of the remainder of the ADEA.” Id. at 245, 125 S.Ct. at 1548. Although 29 CFR § 1625.7 is primarily analyzing “reasonable factor other than age” not “any individual,” we “can conceive no basis” to ignore the regulation’s broad and unambiguous interpretation of this latter term “simply because the two simultaneously adopted interpretations appear in the same paragraph.” Id. at 247, 125 S.Ct. at 1549. Smith establishes that 29 CFR § 1625.7 “set[s] forth the standards for a disparate-impact claim.” Id. at 240, 125 S.Ct. at 1544 (plurality opinion). We owe deference to these standards to the extent they are reasonable, and they are.
2.
RJ Reynolds also argues that 29 C.F.R. § 1625.7 is not entitled to deference on the question of whether § 4(a)(2) permits disparate impact liability for applicants because the regulation does not address this *1301 question clearly. As we’ve said, this regulation describes the standard for challenging an “employment practice that adversely affects individuals within the protected age group.” 29 C.F.R. § 1625.7(c). RJ Reynolds claims the expansive term “individuals” is ambiguous as to the question in this case.
However, the preamble to the final regulations makes clear that the term “individuals” covers both employees and applicants. The preamble gives a number of examples of cases involving job applicants. See 77 Fed.Reg. 19080, 19084 (2012) (describing a test for “candidates for jobs”); id. at 19086 (describing a test for “applicants for security guard positions”); id. at 19087 (describing how “an employer seeking to hire individuals with technological skills could instruct decision makers” in a way that can “help to overcome age-based stereotypes”). The preamble’s list of “benefits of the rule” then declares that the regulation will address “neutral practices that act as barriers to the employment of older workers”:
Data show that older individuals who become unemployed have more difficulty finding a new position and tend to stay unemployed longer than younger individuals. To the extent that the difficulty in finding new work is attributable to neutral practices that act as barriers to the employment of older workers, the regulation should help to reduce the rate of their unemployment and, thus, help to reduce these unique burdens on society.
Id. at 19092 (footnote omitted). The EEOC’s interpretation is “a reasonable extrapolation of its regulations” and we defer to it “in light of its experience and expertise in protecting those covered by the Act.” Holowecki 552 U.S. at 398, 128 S.Ct. at 1158; see also Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997) (finding agency’s interpretation of its own regulations is controlling “unless plainly erroneous or inconsistent with the regulation” (quotation omitted)).[9]
3.
Finally, there is another reason to defer to the EEOC’s view on the scope of disparate impact liability under the ADEA. Days after the ADEA went into effect, the *1302 Department of Labor, which initially enforced the statute, clarified that neutral “pre-employment” tests must be “reasonably necessary for the specific work to be performed” and “equally applied to all applicants.” 33 Fed.Reg. 9173 (1968).[10] And, in 1981, once the EEOC took over enforcing the statute, it made its view on the scope of disparate impact liability clear in a regulation issued though notice-and-comment rulemaking:
When an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a “factor other than” age, and such a practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity.
29 C.F.R. § 1625.7(d) (1981). This 1981 “regulation affirmed ... the longstanding position of the Department of Labor, the agency that previously administered the ADEA.” Smith, 544 U.S. at 244, 125 S.Ct. at 1547 (Scalia, J., concurring) (referencing both the text of 29 C.F.R. § 1625.7 and the “statement of the EEOC which accompanied publication of the agency’s final interpretation”); see also id. at 239-40, 125 S.Ct. at 1544 (plurality opinion) (defending its interpretation of the ADEA with the fact that “both the Department of Labor, which initially drafted the legislation, and the EEOC, which is the agency charged by Congress with responsibility for implementing the statute, have consistently” pushed the same interpretation (citation omitted)).
The EEOC also stated this view in litigation as early as a 1995 brief before the Supreme Court.[11] And the EEOC now *1303 advances this same interpretation in the amicus brief filed in this case. “Under Auer v. Robbins, we defer to an agency’s interpretation of its own- regulation, advanced in a legal brief, unless that interpretation is ‘plainly erroneous or inconsistent with the regulation.’” Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 208, 131 S.Ct. 871, 880, 178 L.Ed.2d 716 (2011) (citation omitted). Here “there is no reason to suspect that the position the [EEOC] takes in its amicus brief reflects anything other than the agency’s fair and considered judgment as to what the regulation required at the time this dispute arose.” Id. at 210, 131 S.Ct. at 881. The EEOC insisted on this view since at least 1981 and gave the Supreme Court the exact legal reasoning for this view in 1995. Further, the EEOC’s “brief is thoroughly reasoned and demonstrates a high level of consideration given to the issue; the brief thoroughly and rationally analyzes the statute, the legislative history, and the policy implications of the statutory interpretation.” Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1305 (11th Cir.2008). Because “the opinion set forth in the brief is consistent with the position [the EEOC] has always held,” we must defer to it. Id. We therefore construe § 4(a)(2) of the ADEA to apply to disappointed job applicants like Mr. Villarreal.
III.
We turn next to Mr. Villarreal’s equitable tolling argument. At this early stage, Mr. Villarreal is simply required to “plead the applicability of the doctrine.” Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1391 (3d Cir.1994). We accept the complaint’s allegations as true and construe them in the light most favorable to Mr. Villarreal. Harris v. United Auto. Ins. Grp., Inc., 579 F.3d 1227, 1230 (11th Cir.2009) (per cu-riam).
Mr. Villarreal’s charge of discrimination was filed with the EEOC approximately two-and-a-half years after he first applied for a position with RJ Reynolds. This is well outside the 180-day limitations period. 29 U.S.C. § 626(d)(1)(a). However, Mr. Villarreal has alleged that he was entitled to equitable tolling because he did not know — nor could he have known — that he had been discriminated against until April 2010, when he was informed about the resume review guidelines and RJ Reynolds’s hiring practices.
The District Court rejected this argument. It found that Mr. Villarreal was not entitled to equitable tolling because he did not allege either that RJ Reynolds had misrepresented relevant facts or that he had diligently pursued his rights by asking the company why he had not been hired. On appeal, Mr. Villarreal contends that the District Court applied the wrong legal standard, and under the specific facts of his case, those allegations are not required. We agree.
Forty years ago, our predecessor Circuit first considered 'this issue in Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924 (5th Cir.1975).[12] Reeb observed that *1304 courts must take special care when considering the timeliness of employment discrimination claims because an employee may not always have enough information to file suit within the limitations period. Id. at 929-31. Indeed, as it explained, “[s]eeret preferences in hiring and even more subtle means of illegal discrimination, because of their very nature, are unlikely to be readily apparent to the individual discriminated against.” Id. at 931. Thus, the court held that in employment discrimination cases, the limitations period is equitably tolled “until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.” Id. at 930.
Since Reeb was decided, we have regularly reaffirmed the “reasonably prudent” person standard in our ADEA cases. See, e.g., Jones v. Dillard’s, Inc., 331 F.3d 1259, 1267 (11th Cir.2003) (“The applicable limitations period did not begin to run until the facts supporting a cause of action became apparent or should have became apparent to a reasonably prudent person with concern for his or her rights.”); Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025 (11th Cir.1994) (“Under equitable modification, a limitations period does not start to run until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights.”); Cocke v. Merrill Lynch & Co., 817 F.2d 1559, 1561 (11th Cir.1987) (per curiam) (“Rather, equitable tolling focuses on the employee with a reasonably prudent regard for his rights.”).[13]
Three additional aspects of our ADEA equitable tolling standard are important here. First — and contrary to what the District Court found — we do not require misrepresentation by the employer. In fact, we have expressly held to the contrary. See, e.g., Browning v. AT & T Paradyne, 120 F.3d 222, 226 (11th Cir.1997) (“[E]quitable tolling does not require any misconduct on the part of the defendant.”); Cocke, 817 F.2d at 1561 (“[E]qui-table tolling does not require, employer misconduct.”). Rather, we inquire into whether “the facts supporting a cause of action became apparent or should have became apparent to a reasonably prudent person with concern for his or her rights.” Jones, 331 F.3d at 1267. And based on this inquiry, this Court has allowed equitable tolling in cases where employers concealed or misrepresented facts. See id. at *1305 1264, 1267; Sturniolo, 15 F.3d at 1025-26. After all, when evidence of discrimination is deliberately hidden, even a reasonably prudent person would have little opportunity to uncover it. But there are circumstances other than concealment and misrepresentation which place relevant facts beyond the reach of a reasonably prudent victim of discrimination. In these cases the ultimate question is not whether an employer deliberately hid facts. Rather, we ask whether reasonable prudence would have resulted in the plaintiff uncovering hidden facts earlier.
Second, a person’s “mere suspicion of age discrimination, unsupported by personal knowledge,” does not trigger the limitations period. Sturniolo, 15 F.3d at 1026. Instead, the clock does not begin to run until she has enough information to support her cause of action. Id. at 1025-26.
Finally, because “[s]ecret preferences in hiring” are “unlikely to be readily apparent to the individual discriminated against,” Reeb, 516 F.2d at 931, our precedent makes clear that a plaintiff need not undertake an entirely futile investigation into hidden discriminatory practices in the name of “due diligence.” Thus, while Mr. Villarreal’s diligence may be relevant to the ultimate inquiry-at what point the facts necessary to support his lawsuit “should [have been] apparent to a person with a reasonably prudent regard for his rights,” id. at 930-his failure to ask RJ Reynolds why he had not been hired is not fatal to his claim.[14]
Our decision in Jones illustrates this point. In Jones, plaintiff Gerda Byrd worked as an “assistant area sales manager” at a department store. 331 F.3d at 1261. In May 1999, Ms. Byrd learned that the store intended to eliminate her position as part of its restructuring. Id. It allowed her to choose between taking another position or accepting severance pay, and she chose the latter. Id. In June 1999, however, Ms. Byrd learned that the store planned to hire two new assistant area sales managers. Id. She immediately suspected that she had been the victim of age discrimination, and recorded her suspicions in typed notes. Id.
Several months later, in October 1999, the store filled Ms. Byrd’s former position with a younger applicant. Id. at 1261-62. Ms. Byrd learned about the hire in November 1999 and filed her charge of discrimination with the EEOC in February 2000. Id. at 1262-63. The district court found that Ms. Byrd’s federal lawsuit was untimely because her charge of discrimination had been filed more than 180 days after any allegedly discriminatory act. See id. at 1262.
On appeal, our Court considered whether to apply equitable tolling to save Ms. Byrd’s claim. We observed that the ADEAs limitations period could have been triggered on three possible dates: (1) April or May 1999, when Ms. Byrd was first told that her position would be eliminated; (2) June 1999, when she discovered that the store planned to hire two new assistant area sales managers and recorded her suspicion of age discrimination; or (3) November 1999, when she learned that her former position had been filled by a younger applicant. Id. at 1263.
*1306 Without addressing whether Ms. Byrd had investigated the circumstances of her replacement, we explained that the third option was the “only one consistent with our precedent and the facts of [the] case.” Id. at 1268. Thus, we held that the ADEA’s limitations period had been equitably tolled until November 1999: it was only then that Ms. Byrd had “sufficient evidence to support her age discrimination claim.” Id. at 1266. We emphasized that even Ms. Byrd’s June 1999 discovery that the store planned to hire two new assistant area sales managers was insufficient to trigger the limitations period because Ms. Byrd could not have been expected to act on “mere suspicion.” Id. at 1267.
Jones controls here. If anything, Mr. Villarreal’s case presents an even stronger argument for equitable tolling because unlike Ms. Byrd, Mr. Villarreal alleges that he could not have even suspected age discrimination until shortly before he filed his charge of discrimination. Specifically, although Mr. Villarreal applied for a Territory Manager position in November 2007, he alleges that neither the application itself nor any other information available to him described RJ Reynolds’s hiring process, the resume review guidelines, or the statistical disparities in the ages of successful applicants. Indeed, because RJ Reynolds never contacted Mr. Villarreal about his application, all he could have known until April 2010 was that he applied for a Territory Manager position but was never offered the job.[15] These facts were simply insufficient to support his cause of action and trigger the limitations period.
Accepting Mr. Villarreal’s allegations as true and drawing all inferences in his favor — as we must, at this stage — we hold that Mr. Villarreal has stated a claim for equitable tolling. We offer no view on whether he will ultimately be able to benefit from the doctrine. The factual question remains whether a person such as Mr. Villarreal, with a reasonably prudent regard for his rights, could have learned the facts necessary to support his lawsuit earlier than April 2010. See Reeb, 516 F.2d at 931. We reverse the District Court’s dismissal of Mr. Villarreal’s pre-November 2009 disparate treatment claims as time-barred and remand for further proceedings.[16]
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

. The limitations period is extended to 300 days if there exists a state agency equivalent to the EEOC. Jones v. Dillard’s, Inc., 331 F.3d 1259, 1263 (11th Cir.2003) (citing 29 U.S.C. §§ 626(d), 633). Georgia does not have such an agency, so the 180-day period applies here.

. November 19, 2009, is 180 days before Mr. Villarreal filed his charge of discrimination with the EEOC. The District Court’s timeliness ruling applied to all plaintiffs in the collective action. See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1214 (11th Cir.2001) (per curiam).

. Our Court has also characterized Griggs in this way. See EEOC v. Joe’s Stone Crab, Inc., 220 F.3d 1263, 1279 n. 16 (11th Cir.2000) ("In Griggs ... the plaintiffs showed that the objective and facially neutral requirements ... in order to be hired or transferred ... had a disproportionate effect on white and black applicants.”); id. at 1282 n. 18 (reading Griggs to apply to "neutral hiring and promotion practices”); Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant, 491 F.2d 1364, 1371-72 & n. 17, 1373 & n. 25 (5th Cir.1974) (interpreting and applying Griggs as permitting disparate impact hiring claims brought by "potential ... employees” and "potential ... hirees”); United States v. Ga. Power Co., 474 F.2d 906, 911 (5th Cir.1973) ("In Griggs ... the Supreme Court held that the proviso of this section means that no test used for hiring or promotion is valid if it ‘operates to exclude [African Americans] [and] cannot be shown to be related to job performance.’ ” (second alteration in original)) (applying Griggs to disparate impact hiring, recruitment, and promotion claims).

. Justice O’Connor noted that “[s]ection 4(a)(2), of course, does not apply to 'applicants for employment’ at all — it is only § 4(a)(1) that protects this group.” 544 U.S. at 266, 125 S.Ct. at 1559 (O’Connor, J., concurring). Justice Scalia responded by noting that "perhaps the agency's attempt to sweep employment applications into the disparate-impact prohibition is mistaken.” Id. at 246 n. 3, 125 S.Ct. at 1548 n. 3 (Scalia, J., concurring).
The dissent suggests that other Justices in Smith endorsed Justice O’Connor’s dicta because "nobody disagreed with her.” The dissent then quotes our observation that "there is dicta, and then there is Supreme Court dicta.” Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir.2006). Along the same lines: there is dicta in a binding opinion and there is dicta in a nonbinding concurrence. It’s one thing to abide by dicta that is "three long, citation-laden paragraphs” of "well thought out, thoroughly reasoned, and carefully articulated analysis” in a majority opinion, as Schwab did. Id. It’s another to do the same for a single sentence in a minority opinion, via the assumption that other Justices implicitly approved of this sentence.
As for the Smith plurality, the dissent, points to a footnote in this opinion comparing § 4(a)(l)’s focus on an employer’s motives to § 4(a)(2)’s focus on the effects of an employer's actions. The dissent quotes a passage from this footnote that explains how § 4(a)(2) operates for claims brought by current employees. But this passage doesn’t exclude § 4(a)(2) from applying to other kinds of claims. The Court was simply explaining how the statute works for claims like the ones then before them. And the plurality even cited cases brought by job applicants to declare that "for over two decades after our decision in Griggs, the Courts of Appeals uniformly interpreted the ADEA as authorizing recovery on a ‘disparate-impact’ theory in appropriate cases.” 544 U.S. at 236-37 & n. 8, 125 S.Ct. at 1542-43 & n. 8 (citing Wooden v. Bd. of Educ. of Jefferson Cty., 931 F.2d 376 (6th Cir.1991), and Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419 (10th Cir.1993)).

. As for the dicta from other circuits that the dissent cites, the first of these cases distinguished the ADEA from Title VII by explaining that "the basis for the Supreme Court’s holding in Griggs " was Title VII’s reference to "employees or applicants.” E.E.O.C. v. Francis W. Parker Sch., 41 F.3d 1073, 1077 (7th Cir.1994). As discussed above, this language was added to Title VII after Griggs. The two other cases cited by the dissent both relied on Francis W. Parker. This is the problem with dicta: when an issue is superfluous, even obvious errors escape notice.

. At least some of the specific references to job applicants or hiring in other provisions may be explainable. For example, Mr. Villarreal argues that the prohibition on labor union practices that harm an individual’s "status as an employee or as an applicant for employment” is meant to address the unique way that certain unions influence someone’s "status” as a job applicant specifically by referring employers to applicants through union hiring halls. True or not, this point underscores the danger of trying to guess why Congress chose broad or ambiguous terms based on guesses about why it chose specific terms on other occasions. For this reason,' the "presumption” of uniform usage "is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.” Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 595, 124 S.Ct. 1236, 1245, 157 L.Ed.2d 1094 (2004) (holding that the word "age” has different meanings in different parts of the ADEA).

. In addition, the next subsection of the statute uses the term "any individual” to refer solely to job applicants. See 29 U.S.C. § 623(b). This section makes it "unlawful for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual." Id. (emphasis added). The ADEA’s definition section later explains that employment agencies solely work with applicants for employments. See id. § 630(c).

. Meanwhile, RJ Reynolds points to other legislative history suggesting that Congress did not intend § 4(a)(2) to cover job applicants. For example, one legislative document explained that § 4(a)(2) would make it unlawful "[t]o limit, segregate, or classify employees so as to deprive them of employment opportunities or adversely affect their status.” 113 Cong. Rec. 31,250 (1967) (emphases added). RJ Reynolds argues that this document proves that Congress did not want § 4(a)(2) to cover job applicants. But then again, maybe this document proves the contrary: maybe it shows that at least one person in or around Congress knew how to unambiguously limit § 4(a)(2) to current employees but Congress itself enacted broader language.

. RJ Reynolds argues we should not defer to the EEOC’s view that § 4(a)(2) covers job applicants because the EEOC’s disparate impact regulation "parrots” an ambiguous statutory term. See Gonzales v. Oregon, 546 U.S. 243, 257, 126 S.Ct. 904, 916, 163 L.Ed.2d 748 (2006) ("An agency does not acquire special authority to interpret its own words when ... it has elected merely to paraphrase the statutory language.”).
We reject this argument for two reasons. First, the regulation in Holowecki also used the same "term Congress used in the underlying statute.” Holowecki, 552 U.S at 398, 128 S.Ct. at 1156. But the Court distinguished Gonzales by noting that the EEOC had consistently and reasonably advanced the same view for years. See id. at 399, 128 S.Ct. at 1156. As we discuss in section II.B.3, the EEOC has done the same here, so its view is "entitled to a 'measure of respect' under the less deferential Skidmore standard.” Id.
Second, the Gonzales regulation parroted the statutory terms "course of professional practice” and “legitimate medical purpose.” Gonzales, 546 U.S. at 257, 126 S.Ct. at 916. These two terms did not clearly answer the question in the case. In contrast, RJ Reynolds does not claim here that the statutory term “any individual” is by itself unclear. Instead, the company argues this term should be limited by the separate term "his employees.” The regulation imposes no such limitation. It simply prohibits "[a]ny employment practice that adversely affects individuals within the protected age group on the basis of older age.” For this reason, the text of the regulation lacks the ambiguity in the statute. So, even if we were to assume that the regulation was somehow still ambiguous, Auer requires us to defer to the EEOC's clarification of this ambiguity. See Holowecki, 552 U.S at 398-99, 128 S.Ct. at 1156.

. Indeed, the EEOC first advanced this construction before the ADEA was even passed into law, as an interpretation of the identical Title VII language: in 1966, the agency issued Guidelines on Employment Testing Procedures which required that employment testing "fairly measures the knowledge or skills required by the particular job or class of jobs which the applicant seeks, or which fairly affords the employer a chance to measure the applicant's ability.” Griggs, 401 U.S. at 433 n. 9, 91 S.Ct. at 855 n. 9 (quoting EEOC guidelines) (emphasis added). Because these guidelines form part of "the background against which Congress enacted” the ADEA, they are a clue into Congress's intent in using the same language in the ADEA. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 147, 120 S.Ct. 1291, 1308, 146 L.Ed.2d 121 (2000).

. See Petition for a Writ of Certiorari at 12-13, EEOC v. Francis W. Parker Sch., 515 U.S. 1142, 115 S.Ct. 25 (1995) (No. 94-1558), 1995 WL 17047545 ("The court of appeals ... reasoned that ... Section 4(a)(2) protects only incumbent employees. That reasoning is seriously flawed. By its express terms, Section 4(a)(2) is not limited to protecting incumbent employees. Although Section 4(a)(2) makes it unlawful for an employer 'to limit, segregate, or classify his employees,’ the employer may not engage in such conduct 'in any way which would deprive or tend to deprive any individual of employment opportunities.’ ... The use of the term 'individuad' rather than ‘employee’ indicates that Section 4(a)(2) protects applicants for employment.”); see also Brief of the Equal Employment Opportunity Commission as Appellee at n. 2, EEOC v. Allstate Ins. Co., 528 F.3d 1042 (8th Cir.2008) (No. 07-1559), 2007 WL 6604487 (8th Cir.2007).
RJ Reynolds claims the EEOC’s litigation positions are not consistent because an earlier EEOC brief filed while the Francis W. Parker School case was in the Seventh Circuit stated that "[e]ven if applicants are not covered by subsection 4(a)(2), disparate impact theory applies to them by virtue of subsection 4(a)(1).” EEOC Reply Brief at 4, EEOC v. Francis W. Parker Sch., 41 F.3d 1073 (7th Cir.1994) (No. 93-3395), 1994 WL 16045193. This alternative basis was later foreclosed by Smith’s holding that § 4(a)(2) permits disparate impact but § 4(a)(1) does not. When the EEOC petitioned for certiorari in Francis Parker School, the agency made the exact same argument about § 4(a)(2) it makes in this case.
RJ Reynolds argues that the two Francis W. Parker School briefs show that the agency was *1303 "waffling” in its position on § 4(a)(2). But the EEOC’s Seventh Circuit brief never said that § 4(a)(2) did not apply; it simply said that § 4(a)(1) would apply "even if” § 4(a)(2) did not. The EEOC offered this alternative argument after noting that the Seventh Circuit "has already interpreted the language of subsection 4(a)(1) to authorize the use of disparate impact in Title VII.” Id. And when the EEOC sought review of the Seventh Circuit's ruling in the Supreme Court, the agency made the exact argument it now makes before us.

. In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1207.

. Although the dissent argues that our precedent requires "a showing of extraordinary circumstances” to warrant equitable tolling, it cites a Social Security Act decision for this proposition. Jackson v. Astrue, 506 F.3d 1349, 1351 (11th Cir.2007). In Jackson, we refused to apply equitable tolling to excuse a Social Security claimant's untimely appeal of an administrative decision denying her benefits because she had not shown "extraordinary circumstances.” See id. at 1353-54 ("We think the law clearly requires that a finding of extraordinary circumstances is necessary before a court may equitably toll the SSA’s statutory period, and this determination is reserved for extraordinary facts.” (quotation omitted)).
However, we are unaware of any ADEA case that imposes such a requirement. See, e.g., Jones, 331 F.3d at 1263-67 (applying equitable tolling without requiring "extraordinary circumstances”); Hargett v. Valley Fed. Sav. Bank, 60 F.3d 754, 764-65 (11th Cir.1995) (same); Sturniolo, 15 F.3d at 1024-26 (same); Cocke, 817 F.2d at 1561-62 (same). Applying a less stringent standard in this context makes good sense because discriminatory hiring practices are "unlikely to be readily apparent to the individual discriminated against.” Reeb, 516 F.2d at 931. Thus, unlike a Social Security claimant who has all the information necessary to appeal at the time her application for benefits is denied, an employee or applicant for employment may not know any relevant facts at the time of the discriminatory act. See Jones, 331 F.3d at 1264.

. Along the same lines, the dissent correctly observes that "it might have been somewhat difficult” for Mr. Villarreal to gather facts necessary to establish his discrimination claim since RJ Reynolds used third-party services to screen applicants. But the use of third-party services is not the only difficulty spurned applicants will face. A disappointed applicant inquiring of an employer about the age and identity of whoever was hired in his stead will likely not be well received. Indeed, employers have every incentive to hold this type of information close.

. The dissent overlooks this point entirely. The question here is not what a reasonably prudent person would have done, but whether the relevant facts would have "[become] apparent to a reasonably prudent person” any earlier than April 2010. Jones, 331 F.3d at 1267. Mr. Villarreal alleges that a reasonably prudent person could not have discovered RJ Reynolds's allegedly discriminatory practices until that time. This is a facially plausible claim, which is all that is required at this early stage. Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir.2012) (per curiam) (stating that, to survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face” (quotation omitted)).

. Mr. Villarreal also argues that, in the alternative, his charge of discrimination was timely under the "continuing violation doctrine.” See Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110, 122 S.Ct. 2061, 2071, 153 L.Ed.2d 106 (2002). Because we agree that he has stated a claim for equitable tolling, we need not reach this issue.